STATE of Missouri, Respondent,

v.

Kimber EDWARDS, Appellant.

No. SC 84648.

Supreme Court of Missouri,
En Banc.

Aug. 26, 2003.

Rehearing Denied Oct. 28, 2003.

Janet M. Thompson, Charles D. Moreland, Office of the Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Evan J. Buchheim, John M. Morris, Asst. Attys. Gen., Office of the Attorney General, Jefferson City, for Respondent.

LAURA DENVIR STITH, Judge.

A jury found Kimber Edwards guilty of the first-degree murder of his ex-wife, Kimberly Cantrell, and recommended a sentence of death. The trial court entered a death sentence in accordance with the jury's recommendation. Mr. Edwards appeals both the determination of guilt and the imposition of a death sentence. This Court has exclusive appellate jurisdiction pursuant to Mo. Const. art. V, sec. 3. For the reasons set out below, this Court affirms the judgment in all respects.

## I. FACTS AND PROCEDURAL BACK-GROUND

Considering the evidence in the light most favorable to the verdict, *State v. Thompson*, 985 S.W.2d 779 (Mo. banc 1999), the record reveals the following facts:

Fourteen-year-old Erica Edwards called her Aunt Phyllis on the evening of August 23, 2000, to see whether her aunt knew where Erica's mother was. Erica's father, Kimber Edwards (defendant), and her mother, Kimberly Cantrell (the victim), had divorced in 1990. Erica was in the primary physical custody of her mother and usually lived at her mother's home in

University City, Missouri, a St. Louis suburb.

Mr. Edwards was 37 years old and worked as a correctional officer at the St. Louis City jail. He had initially been ordered to pay $35.00 per week in child support for Erica, but the amount of child support was more than doubled, to $351.00 per month, in 1995. In March 2000, the prosecutor charged Mr. Edwards with failing to pay any of his court-ordered child support for the 12–month period from March 1999 to March 2000, a class D felony. He pleaded not guilty. The prosecutor offered what was described as a standard plea bargain under which Mr. Edwards would receive a suspended imposition of sentence (SIS) and five years probation in return for his agreement to plead guilty, to make a lump-sum payment of $1,500, and to pay $500 per month thereafter ($351 towards current support obligations and $149 towards his arrearage). He had to decide whether to accept the prosecutor's offer at a settlement conference, or court appearance, set for August 25, 2000.[1]

For the three weeks prior to August 22, 2000, Erica had been staying with her father, his wife, Jada, and their two children, Tierra and Britney, in their home in the City of St. Louis. Erica's mother, Ms. Cantrell, was due to pick up Erica the next day, but had not called Erica to make final arrangements, and no one answered the telephone at Ms. Cantrell's house. Ms. Cantrell had last been seen leaving her place of employment around 5:06 p.m. on August 22, but did not show up for or call her work on August 23, which was unusual for her. Ms. Cantrell also failed to show up for the first night of an evening class

held on August 22 at a local community college.

After Erica called her aunt the evening of August 23, 2000, the aunt, along with Ms. Cantrell's mother-in-law and another friend, went to Ms. Cantrell's house. They discovered Ms. Cantrell's body about 9:30 p.m.; she had been shot twice in the head at close range. The police were called. After speaking with the victim's family and partially investigating the crime scene, detectives decided to drive to Mr. Edwards' home to speak with him about who might have killed Ms. Cantrell. The detectives arrived at about 3:00 a.m. on August 24. They informed Mr. Edwards that Ms. Cantrell was dead and asked him, his wife, and the children to accompany them to the police station to assist in their investigation. Mr. Edwards and Jada traveled in one car, the children in another. At the station, Mr. Edwards was taken to an interrogation room, Jada to a secretary's office, and the children to the deputy juvenile officer's office. Police said that none was arrested or placed in custody, although Mr. and Mrs. Edwards were potential suspects.

During his August 24 interview, Mr. Edwards did not make any incriminating statements. He told detectives that he had been working out of town and had not returned until August 22, 2000. He said he spent that day taking his daughters to doctors' appointments and doing some electrical work at one of his rental properties on Palm Street in St. Louis. He said he last saw his ex-wife on August 10. He avoided seeing her because they argued about custody and child support and she was angry about an ongoing dispute over child support. He told detectives that he did not kill his ex-wife and that he knew of

---

1. Mr. Edwards appeared at the August 25 conference, three days after his ex-wife's death, with his attorney and pled not guilty. The case was continued to September 29, 2000.

no one who would want to kill her. After his interview, detectives drove all of the family but Erica home. Erica, who had been scheduled to go to her mother's house, went home with her Aunt Phyllis. The next day authorities placed Erica in her aunt's custody pending their investigation of Ms. Cantrell's death, noting in their petition that Mr. Edwards was a potential suspect.

Later that morning, police questioned Ms. Cantrell's next-door neighbors to see whether they had seen anything related to the murder. Christopher Harrington, then in ninth grade, told police that he had seen and heard a black man wearing a black backpack banging on Ms. Cantrell's door in the late afternoon of August 22, and that the man walked away after there was no answer. Christopher's younger brother, Brandon, age 12, heard shots and a woman scream at around 5:15 to 5:30 p.m. while he was home watching television.

The next day, August 25, 2000, detectives drove to Mr. Edwards' rental properties to verify his statement that he had been there on August 22 repairing electrical problems. While approaching the property detectives saw a man, who later identified himself as Ortell Wilson, sitting on the front steps.[2] Mr. Wilson lived in one of Mr. Edwards' rental properties rent-free in exchange for performing maintenance work and other jobs.

Because Mr. Wilson matched the description of the person that Christopher Harrington had seen knocking on Ms. Cantrell's door on August 22, detectives asked him to come to the police station, where he was interviewed and photographed. They searched his apartment and seized a black backpack in which they found rubber fingertips. Christopher Harrington later picked Mr. Wilson out of a photographic show-up. Mr. Wilson was charged with the first-degree murder of Kimberly Cantrell.

The following day, August 26, 2000, a police officer who was related to the victim arrested Mr. Edwards on an unrelated charge, alleging that Mr. Edwards interfered while the officer was trying to ticket him for having cars parked on the grass. He was booked and held. While Mr. Edwards was being held, police again questioned Mr. Wilson. As a result of the questioning, Mr. Wilson took the police to a vacant building where he said he had hidden the murder weapon. A gun and a box of ammunition were found. The weapon had recently been fired, and three rounds were missing. Bullets found in Ms. Cantrell's apartment later were determined to be from the weapon to which Mr. Wilson led the police.

Mr. Wilson implicated Mr. Edwards in the murder, and University City police arrested Mr. Edwards for Ms. Cantrell's murder the afternoon of August 27, as he was being released by St. Louis police. Defendant was put in an interrogation room and was informed by detectives that Mr. Wilson was in custody and had spoken with them and that they had recovered the murder weapon. Defendant orally waived his *Miranda* rights and signed a waiver of those rights. Police showed him the weapon and some photographs of the crime scene. At first, he continued to deny involvement. Police told him they would have to keep investigating his claims, including re-interviewing his wife and children. At that point, he agreed to make a statement if it would avoid the need for his

---

**2.** Mr. Wilson's name is variously spelled in the record as "Ortell," "Orthell" and "Orthel." "Ortell," the spelling used in the judg-ment sentencing him for the murder of Ms. Cantrell, is the one adopted herein.

family to be interviewed again. He said that he had hired someone named "Michael" to kill Ms. Cantrell. He said that "Michael" overheard him talking about the problems that he and Ms. Cantrell were having, including their upcoming court date regarding child support, and approached him offering to take care of the "problem" for $1,600 dollars. He recounted later discussions between himself and "Michael" and said that they eventually agreed to the price. He told "Michael" that he would deal only with him, gave "Michael" Ms. Cantrell's address, told him her regular routine, and let him know that he would be able to get a key to her apartment.

Detectives asked whether "Michael" was really Ortell Wilson. Defendant said that he was not but that Mr. Wilson had approached him and asked why he was not given "the job." On that same day, he saw Mr. Wilson sitting in the passenger seat of "Michael's" car. Defendant further said that Mr. Wilson approached him and said that he helped with the murder and wanted some money. Defendant said he told Mr. Wilson that he'd have to get his money from "Michael." Defendant refused to repeat his statements on videotape but did confirm what he told detectives in a written statement.

Detectives again spoke with Mr. Wilson on August 28. They then re-read defendant his *Miranda* rights, received a written waiver, and re-interviewed him. After being told that Mr. Wilson's statement differed from his own, defendant told detectives that he had left out some details earlier. He then gave them a second oral and written statement in which he said that Mr. Wilson had approached him on August 3 and told him that he and "Michael" were working together. At first he had pretended not to know what Mr. Wilson was talking about, but later told Mr.

Wilson that he would get paid whatever he and "Michael" agreed upon. The statement said Mr. Wilson left defendant a message on August 24 that the job was done and he wanted to be paid.

In addition to presenting the above evidence at trial, the prosecutor called Donnell Watson, Mr. Wilson's roommate at the time of Ms. Cantrell's murder. Mr. Watson testified that Mr. Edwards went to Mr. Wilson's apartment on August 21, 2000. On August 22, Mr. Watson and Mr. Wilson drove together to their place of employment. Mr. Wilson typically carried a bag with him to work and, on that morning, carried a black bag. After the men got off work at about 4:00 p.m., Mr. Wilson asked Mr. Watson whether the latter could drop him off in University City where he needed to do some work. Mr. Watson agreed and dropped Mr. Wilson off at the corner of Midland and Olive, a location 200–300 yards from Ms. Cantrell's apartment. Mr. Wilson was carrying his backpack. Mr. Wilson returned home around 7:30 p.m. Mr. Edwards came to the apartment that evening around 8:00 p.m.

Hughie Wilson, Ortell Wilson's brother and also a former tenant and apartment complex employee of defendant, testified that in the spring or summer of 2000 defendant asked whether he knew where to get a "throwaway" gun. Nothing came of that conversation. Hughie Wilson further testified that in early August 2000, while visiting his brother's apartment, he saw a gun on a table in Mr. Wilson's bedroom. Both Ortell Wilson and defendant were present in the room, and when defendant saw Hughie, he told Ortell Wilson to put the gun away, which Ortell did. Hughie testified that the gun he saw that day looked similar to the weapon eventually identified as the murder weapon.

Prior to trial, defendant had filed a motion to suppress his statements confessing

to hiring "Michael," arguing the statements were the product of physical and psychological coercion. That motion was overruled. At trial, he made an offer of proof that he had faxed a statement to the University City police on August 26 stating that he invoked his right to counsel, and that he had again said he wanted counsel before being questioned on August 27. The trial court accepted the offer of proof, allowing defendant to present the evidence. Defendant then asked the trial court to reconsider its ruling on his motion to suppress his confession. The court said even in light of the new evidence it would overrule the motion. Defendant continued testifying briefly but failed to introduce any of the evidence about invoking his right to counsel. During defendant's testimony, he denied having met with Ortell Wilson on August 22, 23, or 24. He further testified that he did not cause anyone to kill his ex-wife, that he did not have any connection with her death, and that his confessions to hiring "Michael" to kill her were coerced and untrue.

The jury found defendant guilty of first-degree murder. The penalty phase of the trial was held before the same jury. Defendant chose not to testify again in that phase of the trial. The state presented two victim impact witnesses, the brother and sister of Ms. Cantrell. Defendant presented nine witnesses—family, friends, and co-workers who testified to his good behavior and his love for his family. His mother also testified about his childhood. The jury found one statutory aggravating circumstance: that he had hired Ortell Wilson and/or a person known as "Michael" to murder Kimberly Cantrell. It recommended death, and the trial court followed the recommendation and sentenced defendant to death. Defendant appeals.

## II. GUILT PHASE

Defendant argues that numerous errors occurred in the guilt phase of the trial, including that: (A) two *Batson* challenges were improperly disallowed; (B) voir dire was unreasonably restricted; (C) his statements to police should have been suppressed; (D) the court erred in admitting statements of Mr. Wilson, a non-testifying co-defendant; (E) evidence was improperly admitted that he did not plead guilty to criminal non-support; (F) the prosecutor failed to disclose before trial a comment by defendant that his ex-wife's death was not his business; (G) the court erred in denying a continuance to locate a witness; and (H) the prosecutor made improper comments in voir dire and guilt phase closing.

### A. Batson *Challenges*

Defendant contends that the trial court erred in overruling his *Batson*[3] challenges to the state's use of two of its peremptory strikes against two African–American members of the jury venire, Laverne Evans and Ronald Burton. *Batson* held the "Equal Protection Clause of the Fourteenth Amendment governs the exercise of peremptory challenges by a prosecutor in a criminal trial." *State v. Brown*, 958 S.W.2d 553 (Mo. banc 1997). In *Purkett v. Elem*, 514 U.S. 765, 767–69, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), the Supreme Court set out a three-step test for determining the validity of a *Batson* challenge: (1) the defendant must object that the strike was made on an improper basis, such as race; (2) the burden then shifts to the state to offer a race-neutral explanation for the strike; and (3) if the state does so, then the burden shifts to the defendant to show that the given reason is pretextual. *Id.* This Court recently applied this

---

3. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

test in *State v. Cole,* 71 S.W.3d 163 (Mo. banc 2002), stating:

> After the defendant objects to the state's peremptory strike and identifies the protected class to which the prospective juror belongs, the state must provide a reasonably specific and clear, race-neutral explanation for the strike. If the state articulates a facially neutral explanation, the burden shifts to the defendant to demonstrate the state's explanation was pretextual and that the strike was actually motivated by race.

*Id.* at 172 (citations omitted). *Accord, State v. Marlowe,* 89 S.W.3d 464 (Mo. banc 2002). *Cole* also set out the standard by which this Court reviews a determination that a strike was not discriminatory, stating:

> A trial judge's determination that a peremptory strike was made on racially neutral grounds is entitled to great deference on appeal and will only be overturned if shown to be clearly erroneous leaving the reviewing court with the definite and firm impression that a mistake was made.

71 S.W.3d at 172.

■ Here, defendant objected to the state's strike of Juror Evans, arguing it was based on the fact that she was African-American. The prosecutor denied this, asserting that he struck Juror Evans because she had indicated in voir dire that she believed that her niece had been treated unfairly by the criminal justice system when her niece had been arrested and jailed for three months simply because her boyfriend had used her car when committing a crime. She said her niece was only released once the boyfriend admitted his guilt and that her niece was not involved, and that even then the police "did not say anything else to my niece." The prosecutor concluded from these comments that Juror Evans had some distrust of courts

and prosecutors and struck her for that reason.

■ In response, defense counsel argued that this explanation was pretextual, because the prosecutor failed to strike a similarly situated white juror, Kristin Tincu. A key factor to be considered in determining pretext is "[t]he existence of similarly situated white jurors who were not struck...." *State v. Parker,* 836 S.W.2d 930, 940 (Mo. banc 1992). Defense counsel noted that Juror Tincu had testified that her nephew had received many years in prison for a burglary, yet she was a prosecution witness in a case in which defendants only received seven years in prison for vehicular manslaughter and were already released. Juror Tincu felt that her nephew was treated too harshly and the other men too leniently.

The prosecutor explained that he understood Juror Tincu not to be mad at the court system from her experience, just unhappy with how her nephew had been treated. Moreover, the defense had actually tried to strike Juror Tincu for cause because she had responded to other questions by stating that she might hold it against defendant if he did not testify. She also testified she had two friends who were carjacked, raped, shot, and left for dead, and she would try but might have difficulty keeping her friends' experience from affecting her view of the case if it also involved a shooting. The trial court was not clearly erroneous in rejecting the *Batson* challenge as to Juror Evans.

■ Defense counsel also argued that Ronald Burton was stricken due to his race. In response, the prosecutor stated that he struck Juror Burton because he worked for the postal service and he "always struck postal workers," and related an unfavorable experience he once had with a postal worker. He then stated:

Ever since then I've been going back to my across the board never not strike a postal worker, particularly one that is very quiet and on that reason alone and my reason for that is, number one, postal workers—the post office is probably one of the biggest bureaucratic organizations in the country and the workers, unfortunate for them, are told everyday that there are so many rules and regulations that they have to follow; the mail needs to go in this particular location, that mail needs to go there, they need to make sure that everything goes in a certain location for the mail.

The prosecutor explained that he thought that being on a jury could be a postal worker's chance to ignore rules in a way he could not at work. The prosecutor also noted that he had moved to strike other venire persons whose work was similar to that of a postal worker, specifically mentioning a juror who worked for Federal Express and one who was married to a letter carrier.

Defense counsel responded that the "postal worker" excuse was pretextual because other jurors who also worked for bureaucratic organizations, including one who (the defense incorrectly believed) was a retired military worker and another who worked for a city, were not stricken. The prosecutor responded, stating:

I don't think anybody—he wasn't in the military, first of all, and second of all, I'm talking about postal workers per se being a part of an even—the most bureaucratic organization in the government. I don't think you can even characterize fifty-two as—as close to similarly situated as to juror fifty-six. I mean he works for the postal service.

Case law is real clear that employment such as postal, not all employment, but postal service, that's been—a lot of lawyers use that employment as a reason to strike. I don't think I'm coming up with anything that has never been heard in this courtroom before or even by opposing counsel. This is not a new thing.

The trial court found that the strike was not pretextual and denied the challenge.

As the state notes, prior decisions of this Court and of the court of appeals have approved strikes of potential jurors based in part on their occupations, including an occupation as a postal worker. *See, e.g.,* *State v. Williams,* 97 S.W.3d 462, 472 (Mo. banc 2003); *State v. Smulls,* 935 S.W.2d 9, 16 (Mo. banc 1996) ("Even assuming the prosecutor's reasons for challenging mail sorters and postal workers are non-sensical, this does not establish the reasons are inherently pretextual.").

But, the state goes too far in arguing that a strike automatically survives a charge of pretext if the prosecutor states the strike was based on the prospective juror's occupation as a postal worker, without more. *Batson, Purkett,* and their progeny clearly state that once the prosecutor offers a facially valid reason for a strike, then the defense has an opportunity to show that the reason given is pretextual. If the mere incantation of the phrase "he is a postal worker" were sufficient to overcome any showing of pretext, the third step of the *Batson* test would be illusory. The second step the—identification of a reason, even a nonsensical one, for striking a juror, would end the inquiry. That is not in accordance with the United States or Missouri constitutions.

■ *Parker* is instructive. Although decided before *Purkett* explained how to separate out the second and third steps of *Batson, Parker* required a similar series of steps, stating that if a challenge is made, the prosecutor should then offer an explanation, and the defense then contest it and

the court determine its validity. *Parker,* 836 S.W.2d at 939. It set forth a non-exclusive list of factors that it found especially useful in determining pretext. "The chief consideration should be the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case." *Id.* Second, the "existence of similarly situated white jurors who were not struck by the prosecution is certainly probative of pretext." *Id.* at 940.

Third, "[t]he degree of logical relevance between the proffered explanation and the case to be tried in terms of the kind of crime charged, the nature of the evidence to be adduced, and the potential punishment if the defendant is convicted is likewise important." *Id. Accord, Marlowe,* 89 S.W.3d at 469. Fourth, the "prosecutor's demeanor or statements during voir dire, . . . as well as the demeanor of the excluded venirepersons, should be considered." *Parker,* 836 S.W.2d at 940. Fifth, the "court's past experiences with the prosecutor might also be relevant." *Id.* Finally, "[o]bjective factors bearing on the state's motive to discriminate on the basis of race, such as conditions prevailing in the community and the race of the defendant, the victim, and the material witnesses, are also worthy of consideration." *Id.*

▮ Of course, not all of these factors will apply, or be equally important, in any given case. *State v. Butler,* 731 S.W.2d 265, 268–69 (Mo.App. W.D.1987), however, is useful in explaining how these factors are relevant when a prosecutor seeks to make a strike based on the juror's occupation. *Butler* was one of the first Missouri cases to attempt to make an exhaustive review of the types of factors to be considered in determining whether a particular strike is racially discriminatory. Because it pre-dates *Purkett,* it combines steps two and three, but its statement that, in evalu-

ating the legitimacy of the prosecutor's explanation, the court should consider whether (1) the explanation is race-neutral, (2) related to the case to be tried, (3) clear and reasonably specific, and (4) legitimate, is of continued application today in the analysis of pretext under step 3. *Butler's* discussion of how to apply these principles to a very general claimed basis for exclusion, such as occupation, is particularly useful here:

> In addition, the explanation should not "sweep so broadly as to attenuate its validity," [citation omitted]. If the juror is excluded because of a trait other than race, *the trait must apply to the juror specifically and to the facts of the particular case.*

*Id.* at 269 (emphasis added).

*Butler* then cites *Slappy v. State,* 503 So.2d 350 (Fla.App.1987), with approval. *Slappy* disapproved of the strike of a teacher on the basis of the prosecutor's belief that teachers tend to be liberal, because the prosecutor "did not show any connection between liberalism, school-teaching and the particular jurors and facts of the case." *Id.* at 270. Moreover, a similarly situated white schoolteacher was not stricken. *Butler* itself disapproved of the strike of a potential juror on the basis that she was elderly and the prosecutor had another elderly person on a different jury who was easily intimidated. The court said that without a showing that this rationale applied to this elderly person, the reason given was pretextual. *Butler,* 731 S.W.2d at 271. Similarly, in finding an offered ground pretextual, *Marlowe* noted the low degree of logical relevance of the claimed rationale—class action membership—to the facts of the criminal case before it. *Marlowe,* 89 S.W.3d at 470.

Other judges, in Missouri and elsewhere, have also cautioned that courts

should be especially careful in reviewing claims that a juror was stricken based on a particular occupation. In *State v. Smith*, 791 S.W.2d 744, 749 (Mo.App. E.D.1990), the court rejected a challenge based on the juror's employment by the government, saying that the claim that the prosecutor had bad prior experiences with government employees was pretextual. In *State v. Hudson*, 822 S.W.2d 477, 481 (Mo.App. E.D.1991), the court said "We recognize occupation related explanations are susceptible to abuse as the court in *Smith* found." In *Hudson*, however, the prosecutor was able to tie the prosecutor's strike of a postal worker based on his occupation to personal dealings with postal workers in his work and through his family. The court found this acceptable. *Id.; see also Hernandez v. New York*, 500 U.S. 352, 363–64, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (holding that the disparate impact on a particular ethnic group of an asserted basis for exclusion is one indicator of discriminatory intent); *United States v. Uwaezhoke*, 995 F.2d 388, 392–93 (3d Cir.1993) (discussing how to measure disparate impact and need to relate reason for strike to case).

Other Missouri cases approving striking a postal worker also considered additional reasons for the strike and whether the strike was applied to other similar jurors; the courts did not merely accept a strike based on the person's occupation as postal worker, *per se*. Thus, in *Smulls*, the person also was stricken based on her demeanor, and another person, not African-American, was struck for reasons similar to those for which the person in question was stricken. *Smulls*, 935 S.W.2d at 15–16. In *Williams*, the person was not stricken only because she was a postal worker, but also because she resembled the defendant in physical appearance and demeanor. *Williams*, 97 S.W.3d at 471.

In the future, trial courts should similarly consider strikes based on occupation carefully, assessing them for pretext by looking at whether the occupation and the claimed traits relate to the particular case or juror, whether similarly situated jurors are treated differently, and so forth, considering the factors set out above, and not allow a strike to rest solely on the claim that the juror is "a postal worker."

When considered under this standard, this Court finds that the trial court did not commit clear error in denying the challenge to the peremptory strike of Juror Burton in the instant case. Here, the prosecutor did not merely state that he struck the juror because he was a postal worker. He told the court about his prior negative experience with postal workers as jurors and gave specific reasons why he felt postal workers would not be good jurors. While he did not tie those reasons in with the case against defendant, the lack of pretext in the reasons given was buttressed by the fact that he struck the two prospective jurors who were most similar to Juror Burton—a Federal Express worker and the spouse of a letter carrier. It was for the trial court to weigh this against the fact that he did not strike all those who worked for bureaucracies. The trial court's determination that the strike of Juror Burton was not pretextual was not clearly erroneous.

### B. Voir Dire Restrictions

Defendant claims the trial court unreasonably restricted voir dire questioning when it prohibited counsel, during death qualification voir dire, from questioning the venire about whether they could consider imposing a sentence of life without probation or parole "if the state proved that appellant had hired another to kill his ex-wife, *the mother of his child*." The restriction on asking the jury whether it would be biased by the fact that he

killed the mother of his child, he says, denied him the right to a fair trial with a fair and impartial jury, due process, reliable sentencing, and freedom from cruel and unusual punishment.

 A defendant is entitled to a fair and impartial jury. U.S. Const. amends. VI, XIV; Mo. Const. art. I, sec. 18(a). His counsel may ask questions that help determine whether a venire member holds prejudices or biases that would impair the performance of his or her duties. If prejudices are discovered, an inquiry should take place to reveal whether a juror can set aside prejudices and impartially fulfill his or her obligations as a juror. *See Wainwright v. Witt,* 469 U.S. 412, 421–22, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Morgan v. Illinois,* 504 U.S. 719, 729–30, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Relevant here, it is improper to prohibit a party from inquiring about "critical facts" during voir dire, that is, facts with a "substantial potential for disqualifying bias." *State v. Clark,* 981 S.W.2d 143, 147 (Mo. banc 1998).

 The trial judge is in the best position "to judge whether a disclosure of facts on *voir dire* sufficiently assures the defendant of an impartial trial without at the same time amounting to a prejudicial presentation of evidence." *State v. Leisure,* 749 S.W.2d 366, 373 (Mo. banc 1988). The ruling is reviewed for abuse of discretion. *Id.* at 374. Even where error occurs, to entitle defendant to relief, the prohibition on voir dire must have caused a "real probability of injury." *State v. Betts,* 646 S.W.2d 94, 98 (Mo. banc 1983); *see also State v. Oates,* 12 S.W.3d 307, 310–11 (Mo. banc 2000).

Defendant claims that the relationship between Ms. Cantrell and defendant—that she was also the mother of his child—was a "critical fact" that needed to be divulged to the venire during death qualification voir dire to elicit its effect on the jurors' willingness to consider a sentence of life in prison, citing *Clark.* In *Clark,* a child of three years of age was murdered. The defense wanted to determine whether any venire member had strong reservations about a case involving the murder of a young child. The state objected, arguing that the defense was getting into specifics about the case. *Clark,* 981 S.W.2d at 145. The court sustained the state's objection, stating defendant was "'not entitled to voir dire on specifics of the case being tried.'" *Id.* On appeal, this Court determined that because the victim was a young child, her age was a critical fact that could bias and prejudice the jury, so that the trial court's bar of all inquiry on that fact was reversible error.

This case is distinguishable from *Clark.* Here, the victim was not a child, she was defendant's ex-wife. While the victim and defendant had a child, the child was not present at the scene or directly involved in the crime. This particular inquiry into the relationship of the defendant to the victim and their child was thus not so central to the case as to constitute a "critical fact" within the meaning of *Clark.* Nonetheless, the question did relate to an alleged motive for the crime—to avoid child support. In these circumstances, this Court concludes that the question was a permissible one. But, counsel was not prohibited from getting these same facts before the potential jurors in other ways. The court merely prohibited use of the particular, arguably improperly emotion-laden language defendant wanted to use to inquire into this relationship. The court did not prohibit counsel from telling the jury that

he was accused of having his ex-wife killed to avoid paying child support for their daughter and asking whether they could consider this evidence fairly in deciding punishment.

In fact, during general voir dire, defense counsel asked whether any of the venire members had been through a divorce and, if so, whether the divorce involved child support, child custody, or visitation issues. At another point, he asked a venire person, "With that little bit of information, if you learned the divorce between Kimber Edwards and Kimberly Cantrell involved issues of—over child support, child custody, visitation, would that factor alone cause you to put Kimber Edwards at a disadvantage at trial?" He did not attempt further questioning along this line, nor was he prohibited from doing so, although the responses to this line of questioning would have been enough to alert him to the issues about which he now expresses concern. In these circumstances, no error occurred in refusing to allow him to ask the specific question at issue.

*C. Suppression of Defendant's Statements*

 Defendant argues that the trial court erred in not suppressing the statements he made to police on August 27 and August 28 in which he confessed to hiring "Michael" to kill his ex-wife. This Court reviews a trial court's ruling on a motion to suppress in the light most favorable to the ruling and defers to the trial court's determinations of credibility. *State v. Villa–Perez*, 835 S.W.2d 897, 902 (Mo. banc 1992). The inquiry is limited to whether the decision is supported by substantial evidence, and it will be reversed only if clearly erroneous. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). The Court will consider evidence presented at a pre-trial hearing, as well as any additional evidence presented at trial. *State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc 1999).

When defendant originally filed his motion to suppress before trial, he argued only that the statements were the product of physical and psychological coercion. He explained that he and his family had been taken to the police station in the middle of the night on August 24 and questioned, that Erica was then placed in someone else's custody, and that when he got home he learned that his wife and children had been separately questioned and that his wife had been asked to and had agreed to give samples of her hair to be tested and fingerprinted. Defendant alleges that this conduct was coercive and threatening. He does not seek to suppress any statements made that night, however.

Defendant seeks to suppress statements he made on August 27 and 28, confessing to hiring "Michael" and Mr. Wilson to murder Ms. Cantrell. He alleges that those statements were psychologically coerced because the police said that they would re-interview his wife and children if he did not tell them the truth. Only then, he said, to avoid subjecting his family to what he feared would be a threatening situation, did he agree to make a statement and confess to the crime.

 The court held a hearing on the motion, and then overruled it, finding the confessions were not the product of coercion. Defendant contends that this was erroneous. This Court disagrees. Defendant was a 37–year–old correctional officer working at the St. Louis City jail. He was familiar with police procedures, including those involved in custodial interrogations. He was not under arrest on the night of August 24, nor were his wife and children, although he and his wife were considered to be "potential suspects." The court could have concluded from the evidence that defendant's concerns about his wife

and children were unreasonable and exaggerated and that the police questioned them not to harass them but because they might have relevant information about the victim and about their and defendant's whereabouts and actions in relation to the victim. While defendant's desire to avoid the need for them to come back to the police station on August 27 is understandable, it does not make his subsequent confession the product of coercion. The police do not act unreasonably in investigating a crime. Further, while defendant said he feared that they would take away his children if he did not cooperate, there is no evidence that police threatened to take away his and Jada's children, and Erica was already placed in her aunt's custody.

At trial, defendant said he wanted to make an offer of proof about his confessions. The offer indicated that defendant would testify that after his initial questioning on August 24 but before he was again questioned on August 27, he consulted an attorney and faxed a notice to the police on August 26 that he was represented by counsel. He said that at the beginning of his discussions with police on August 27 he also told them that he was represented by counsel, but that they nonetheless questioned him.

The court said it was going to permit use of the fax and other evidence from the offer of proof, meaning that defendant could offer it at trial. Defendant then renewed his motion to suppress, asking the court to reconsider it in light of the new evidence presented. The court said that the evidence had been available to defendant at the time of his motion to suppress and should have been included with it, but also ruled that the motion would be overruled even considering this evidence because defendant signed *Miranda* waivers of the right to counsel and in the circumstances the court would have found the waivers effective. Defendant then re-took the stand, but failed to offer any of the evidence contained in his offer of proof concerning the alleged lack of voluntariness of his confession.

On appeal, defendant complains that the court refused his offer of proof. As is evident, this is not the case; the court accepted it but then defendant simply failed to offer the evidence at trial. From the nature of his arguments on appeal, it appears that the purpose of the offer was to get the evidence before the trial judge so that the judge might reconsider his ruling on the motion to suppress in light of that evidence. When the court overruled the renewed motion to suppress, defense counsel took that as denying the offer of proof.

Defendant also claims that the court erred in overruling his renewed motion to suppress based upon alleged violations of his right to counsel. Defendant first argues that he invoked his right to counsel by faxing his desire to be represented by counsel to the police on the afternoon of August 26, before he confessed on August 27. Under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), if he had invoked his right to counsel while in custody, yet was nonetheless subjected to uncounseled custodial interrogation, a subsequent confession would not be admissible absent counsel being made available or defendant's initiation of "further communication, exchanges, or conversations with police." *State v. Parker*, 886 S.W.2d 908, 918 (Mo. banc 1994).

■ Here, however, the evidence showed that at the time that defendant alleges he sent the fax invoking his right to counsel he had left the police station, was not in custody, had not been charged but was, along with others, regarded as a "potential suspect." In these circumstances, no Sixth Amendment right to

counsel had arisen, and so, his subsequent interrogation, after being given his *Miranda* rights and waiving them orally and in writing, was not improper. While defendant claims that he again invoked his right to counsel before questioning on August 27, the trial court did not have to accept this claim, which is not supported by any other evidence. The state's evidence does show that he signed *Miranda* waivers on both days and gave written and oral statements on both days. Based on this evidence, again, the trial court did not err in overruling the motion to suppress and admitting his confessions.

### D. Non–Testifying Co–Defendant's Statements Admitted

■ Ortell Wilson, defendant's alleged accomplice and the contract killer, did not testify. The briefs reveal that he was found guilty of first-degree murder in Kimberly Cantrell's death and sentenced to life in prison. Because Mr. Wilson did not testify, police were unable to introduce evidence of Mr. Wilson's statements about Mr. Edwards' involvement in the crime for their truth. To do so would not merely introduce hearsay; it would violate Mr. Edwards' right to confront his accusers, a right protected by the Confrontation Clauses of the United States and Missouri constitutions. *See, e.g., Bruton v. United States*, 391 U.S. 123, 135–37, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *State v. Debler*, 856 S.W.2d 641, 648 (Mo. banc 1993). As defendant recognizes, however, hearsay evidence is nonetheless admissible if it falls within a "firmly rooted" exception or shows particular guarantees of trustworthiness. *Debler*, 856 S.W.2d at 648.

The trial court, cognizant of the above rules, did not permit introduction of Mr. Wilson's statements for their truth, and none of his statements implicating defendant in the crime were admitted at all. Much of the police investigation and dis-

covery of evidence had been based on information told them by Mr. Wilson, however. The prosecutor argued that he needed to introduce some evidence about what Mr. Wilson told the officers to explain why the officers, for instance, went to the deserted house where they found the murder weapon. The trial court permitted use of Mr. Wilson's statements for this limited type of purpose. On appeal, defendant argues that it was not necessary to admit these statements to explain police conduct and that the limitation on the use of the evidence simply was not effective. He also argues that the state purposely used the evidence as a way to circumvent the Confrontation Clause and to present evidence that Mr. Wilson implicated Mr. Edwards as his co-conspirator in the murder.

■ The trial court has broad discretion to admit and exclude evidence at trial. An appellate court will reverse only for an abuse of that discretion. *See State v. Mayes*, 63 S.W.3d 615, 627 (Mo. banc 2001); *State v. Johns*, 34 S.W.3d 93, 103 (Mo. banc 2000). Here, the record shows that the court and all counsel were very concerned about avoiding the types of improper inferences of which defendant now complains. The court went over this issue with counsel very carefully outside the hearing of the jury, approving some questions and disapproving others. The witnesses were directed not to repeat any statements by Mr. Wilson implicating defendant. To a large extent they were successful, merely testifying about their investigations. When testifying about their discussions with Mr. Wilson, they generally would state that they spoke with him and, then, went to a particular location or talked with a particular witness. They attempted not to directly inform the jury of statements made by Mr. Wilson, and on the few occasions when they spoke more directly about what Mr. Wilson told them,

nothing that they said suggested that defendant was guilty. The police rather testified as to how they found the gun, and it was admitted that the gun they found was the murder weapon. It was not claimed that the defendant used the gun himself. The police were permitted to explain how they found the murder weapon.

██ On this record, the Court cannot say that the trial court abused its discretion in overruling defense counsel's objections and allowing the testimony to be offered in this limited fashion to show the officers' subsequent conduct and not for the truth of the matters stated. Hearsay testimony is admissible to explain subsequent conduct. *State v. Black,* 50 S.W.3d 778, 786 (Mo. banc 2001); *State v. Leisure,* 796 S.W.2d 875, 880 (Mo. banc 1990); *see also State v. Basile,* 942 S.W.2d 342, 357–58 (Mo. banc 1997) (no error in admitting statements of co-conspirator to prove state of defendant's marriage rather than for their truth).

*E. Evidence Regarding Failure to Plead Guilty to Criminal Non-Support*

██ Defendant argues that the state improperly attempted to introduce evidence of another crime by repeatedly getting witnesses to state that he had *not* pleaded guilty to criminal non-support at the August 25, 2000, hearing held three days after the murder.

██ Defendant is correct that a defendant has the right to be tried only for the offense for which he is on trial, and that evidence of other crimes committed by defendant is normally inadmissible. *State v. Barriner,* 34 S.W.3d 139 (Mo. banc 2000), *citing, State v. Clover,* 924 S.W.2d 853, 855 (Mo. banc 1996); *State v. Trimble,* 638 S.W.2d 726, 732 (Mo. banc 1982). But, evidence of other crimes is admissible for certain purposes, such as to show motive, intent, lack of accident or mistake, or com-

mon scheme or plan. *State v. Skillicorn,* 944 S.W.2d 877, 886–87 (Mo. banc 1997); *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993); *State v. Kenley,* 693 S.W.2d 79, 81 (Mo. banc 1985). And, as defendant necessarily acknowledges, this exception is applicable here, since the prosecution's theory of the case was that defendant had his ex-wife killed to avoid paying child support. Therefore, the evidence that defendant had not paid child support for over one year and was charged with criminal non-support was clearly relevant to motive.

But, defendant argues, although this evidence was properly admitted, the court erred in also admitting evidence that defendant had *not* pleaded guilty to the crime charged. Even were the latter fact irrelevant, it is hard to understand how it comes within the rule prohibiting evidence of other crimes. As just noted, the reference to the charge of criminal non-support itself was clearly permissible, and evidence that defendant did *not* admit his guilt of the crime can hardly be considered further "other crimes" evidence. Rather, it is evidence of *not* committing a crime. In any event, the fact that, after his ex-wife's death, defendant refused to agree that he owed and did not pay past-due child support is itself independently relevant to substantiate that the desire to avoid these payments was his motive to kill her. The court did not err in overruling defendant's objections to this evidence.

*F. Failure to Disclose Defendant's Comments*

██ Defendant next argues that the state committed a discovery violation when it failed to disclose in discovery two comments that Mr. Edwards made to Detective Brady when interviewed at approximately 5 a.m. on the morning of August 24, 2000. After Detective Brady testified that

he told defendant that his ex-wife was dead, the detective was asked:

> Q: What did you observe when he was told that?
>
> A: Very nonchalant, had a smile on his face, carefree.
>
> Q: Did not seem to be distressed by the news?
>
> A: Not at all.
>
> Q: Did you say anything to him?
>
> A: At one point I did.
>
> Q: What did you say?
>
> A: I told him I couldn't understand how he could just sit there and be so relaxed and have such a carefree attitude knowing that his ex-wife, the mother of his daughter, was killed.
>
> Q: Did he have any response?
>
> A: Shook his head with a smile, said it's not his business. He had nothing to do with it.

At this point, defense counsel approached the bench and asked for a mistrial because the state had failed to disclose in discovery that defendant had said "it's none of his business" and "he had nothing to do with it."

■■■■ The trial court agreed that this violated Rule 25.03, which requires the state to disclose defendant's own statements to him upon request of counsel. Counsel had made such a request. But, determining that the prejudice could be cured by an instruction, the court instructed the jury that it should disregard "the last statement of Detective Brady regarding any words that were uttered by Mr. Edwards." Defendant requested that the court also grant a mistrial. The court refused. Defendant now argues that this constituted reversible error. This Court disagrees:

> The sanction to be imposed for a violation of Rule 25.03 lies within the discre-

> tion of the trial court. *State v. Kilgore,* 771 S.W.2d 57, 66 (Mo. banc), *cert. denied,* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). A trial court's denial of a requested sanction is an abuse of discretion only where the admission of the evidence results in fundamental unfairness to the defendant. *Id.* Fundamental unfairness exists where there is a reasonable likelihood that the failure to disclose the evidence affected the result of the trial. *Id.*

*Rousan,* 961 S.W.2d at 843.

Defendant argues that the lack of disclosure did affect the result of the trial, because it enabled the prosecutor to repeatedly emphasize defendant's coldness and lack of caring about his ex-wife's death. However, defendant has not cited this Court to any point at which the prosecutor repeated either of the two statements that the court ordered stricken. At the points in the transcript cited by defendant, the prosecutor did emphasize defendant's coldness. But, he did so by reminding the jury that the detective had described defendant's attitude as nonchalant, that it was a contract killing, that this indicated cool reflection, that he had shown no remorse, and was cold and dispassionate about the death. It was not just a mistake, it was a business decision.

Defendant, however, did not object to any of the detective's testimony about defendant's nonchalance, about his smiling when he was told of his wife's death, about his lack of caring. His only objection was to the detective's statements that defendant said his ex-wife's death was none of his business and that he had nothing to do with it. The statement that defendant said he had "nothing to do with it" is, if anything, an exculpatory statement, not an inculpatory one. Moreover, it was cumulative, for defendant said a number of times

that he was not involved in his ex-wife's death. Admission of this statement involved no prejudice of any kind.

The only objected-to statement from which any prejudice could have arisen was the detective's statement that defendant said his ex-wife's death was "not his business." In light of the unobjected to testimony that defendant smiled and acted nonchalant and uncaring when he was told his ex-wife had been murdered, the fact that he had said the murder was none of his business—a statement that also could be considered simply to be a denial of involvement in her death—could not have affected the outcome of the trial. Nonetheless, the trial court ordered the jury to disregard the statements. This was a reasonable sanction to impose for the discovery violation. The trial court did not abuse its discretion in so ruling.

### G. Denial of Continuance

 Defendant filed a motion for continuance the day before trial, in which he listed numerous witnesses or pieces of evidence that he wished to locate before trial. The court held a hearing on the record, at which he reviewed each ground for continuance asserted. As to one request, the court ordered partial relief, directing the state to make a witness available for an interview; as to another, the prosecutor agreed to investigate certain facts, and the court left its ruling open for further review.

The ninth ground for continuance in defendant's written motion stated that defense counsel needed a continuance to locate four witnesses, but on appeal he claims error in overruling the motion only as to one of these four witnesses, "Robert Smith." Although defendant's motion for continuance contained no explanation at all as to Mr. Smith's anticipated testimony, at the hearing counsel said that Mr. Smith, a former maintenance man for defendant's

apartment buildings, would testify to defendant's good character and helpfulness. Counsel also believed Mr. Smith would be helpful in impeaching the testimony of Donnell Watson that defendant had gone to Ortell Wilson's apartment the evening of August 22. Counsel said that his investigator had repeatedly tried to find Mr. Smith and serve him with a subpoena but had been unable to do so. When the court asked why counsel believed that he would be any more successful in locating Mr. Smith if granted a continuance, counsel said only that he had reason to believe that Mr. Smith still lived in the City of St. Louis. The court overruled the motion for continuance, stating, "You will have—you'll certainly have time from now until the time you're going to need those witnesses for your investigator to still try to get them served. If you don't, you've had all this time. Chances are you are not going to get them served."

 The decision to grant a continuance is within the sound discretion of the trial court. *State v. Christeson*, 50 S.W.3d 251, 261–62 (Mo. banc 2001); *State v. Wolfe*, 13 S.W.3d 248, 261 (Mo. banc 2000). Reversal is warranted only upon a very strong showing that the court abused its discretion and prejudice resulted. *State v. Middleton*, 995 S.W.2d 443, 465 (Mo. banc 1999); *State v. Taylor*, 944 S.W.2d 925, 930 (Mo. banc 1997). "When ruling on a request for a continuance based upon the absence of a witness, the trial court may consider the probability that the witness cannot be found." *State v. Dodd*, 10 S.W.3d 546, 554 (Mo.App. W.D.1999). If a continuance is not likely to result in the presence of the witness at trial, the court will not be held to have abused its discretion in denying the continuance. *Id.*

 The trial court did not abuse its discretion here. Rule 24.10(b) requires

the party moving for a continuance in order to locate a witness to provide the court with "facts showing reasonable grounds for belief that the attendance or testimony of such witness will be procured within a reasonable time." While defendant did not put this information in his motion, the court properly permitted counsel to supplement the written motion at the hearing with an explanation of his efforts to locate Mr. Smith and how he planned to locate him in the future. *See Lee v. Kemna,* 534 U.S. 362, 372–73, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002) (stating where motion is deficient but record provides judge and counsel with reasonable basis for understanding why witness is needed and what he will testify to, purpose of rule is satisfied and court abuses its discretion in denying motion on technical grounds). Here, however, defense counsel offered the court no explanation as to how future efforts to find Mr. Smith would be more successful than were past efforts and no reason to believe that Mr. Smith would be found within a reasonable time. The trial court acted within its discretion in overruling defendant's motion for continuance.

Moreover, even had the court erred in its ruling, no prejudice resulted. While defense counsel did not explain Mr. Smith's proposed testimony in any detail to the court at the time of the motion for continuance, counsel did locate Mr. Smith by the time of the motion for new trial two months later. Mr. Smith said he sat outside his apartment between 8:00 and 9:00 p.m. on August 22 and saw Mr. Edwards arrive but did not see him go into Mr. Wilson's apartment. But, other testimony put Mr. Edwards at the apartments after 9:00 p.m., and Mr. Smith could not say that Mr. Edwards had never talked to Mr. Wilson that night, just that he had not entered the latter's apartment while Mr. Smith was on his porch between 8:00 and 9:00 p.m. He also did not know whether

Mr. Wilson and Mr. Edwards had met on other nights. This testimony would have had minimal impeachment value and would not have changed the outcome of the trial.

*H. Improper Comments in Voir Dire and Guilt–Phase Closing Argument*

Defendant argues that the prosecutor made two improper comments during voir dire. Defendant acknowledges he did not object to either comment. Defendant also argues that the prosecutor made seven improper statements during guilt-phase closing argument. Again, defendant acknowledges that he did not object to any of these comments.

 By failing to object to the prosecutor's comments made during voir dire and closing argument, defendant failed to preserve his claims of error as to those comments for review. *See, e.g., Mayes,* 63 S.W.3d at 632; *State v. Barnum,* 14 S.W.3d 587, 592 (Mo. banc 2000) (defense counsel's failure to object to prosecutor's statements during voir dire constituted waiver). Counsel nonetheless asks this Court to review his claims for plain error under Rule 30.20, claiming that the comments were so egregious that the trial court erred in not *sua sponte* declaring a mistrial.

 "Courts especially hesitate to find plain error in the context of closing argument because the decision to object is often a matter of trial strategy, [citation omitted], and 'in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention.'" *Mayes,* 63 S.W.3d at 632–33, *quoting, State v. Clemmons,* 753 S.W.2d 901, 907–08 (Mo. banc 1988), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). A conviction will be reversed based on plain error in closing argument only when it is

established that the argument had a decisive effect on the outcome of the trial and amounts to manifest injustice. *Middleton,* 995 S.W.2d at 456.

■■■■ Moreover, both the state and the defense are entitled to argue reasonable inferences from the evidence. *State v. Kreutzer,* 928 S.W.2d 854, 873 (Mo. banc 1996). A trial court maintains broad discretion in the control of closing arguments. *State v. Barton,* 936 S.W.2d 781, 783 (Mo. banc 1996). An argument does not require reversal unless it amounts to prejudicial error. *Barnum,* 14 S.W.3d at 592; *see also State v. Johnson,* 558 S.W.2d 284, 286 (Mo.App. E.D.1977) ("[A]n improper statement on part of counsel during voir dire does not necessarily require declaration of a mistrial or discharge of a jury."). Closing arguments "must be interpreted with the entire record rather than in isolation." *State v. Graham,* 916 S.W.2d 434, 436 (Mo. App. E.D.1996).

■■■■ *Burden of Proof.* Defendant notes that at one point during voir dire, when discussing the need to find aggravating circumstances, the prosecutor misstated the burden of proof by stating that the state had the burden of proving aggravating circumstances "to your satisfaction" unanimously. Counsel's comment can either be taken as a misstatement of the definition of "reasonable doubt" or as a misstatement of the burden of proof as being "to the jury's satisfaction" rather than to a reasonable doubt. In either event, the comment was improper. *See sec.* 565.030.4 ("The trier shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor: (1) If the trier does not find beyond a reasonable doubt at least one of the statutory aggravating circumstances...."). "Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the truth of a proposition." MAI–CR3d 313.30A; *State v. Kenley,* 952 S.W.2d 250, 275 (Mo. banc 1997).

■■■■ But, where, as here, no objection was made to the comment, this Court will not reverse the judgment unless the Court believes the comment affected the outcome of the trial. *State v. Rosendahl,* 938 S.W.2d 274 (Mo.App. W.D.1997), is instructive in making this determination. In that case the prosecutor was held to have attempted to define "reasonable doubt" by stating " 'what you reasonably believe, you cannot reasonably doubt.' " *Id.* at 277. The court noted that counsel is free to discuss reasonable doubt during argument, but cannot attempt to define it, as it may confuse the jury. *Id.* But, the prejudicial effect of the comment must be viewed in context and in light of the proper definition given in the instructions. Considered in this light, the court concluded:

> We review the impermissible argument in the context of the whole argument and under the stricter plain error standard. We are not persuaded that the jury was misled or confused by the prosecutor's argument so as to result in manifest injustice or a miscarriage of justice.

*Id.* As this Court concluded on similar facts in *State v. Burnfin,* 606 S.W.2d 629 (Mo. banc 1980), "in view of the instructions that were given by the court, we cannot say as a matter of law that a jury composed of reasonably intelligent persons were [sic] confused or misled by the argumentative statement of the prosecutor so as to result in manifest injustice or a miscarriage of justice." *Id.* at 631.

Here, while the prosecutor did misstate the law at one point, the correct standard of proof was restated multiple other times during voir dire and in argument, and the

jury was properly instructed. No manifest injustice resulted.

■ *Contract Killing.* Defendant also argues that the prosecutor improperly argued an element of the case when he said that this was a contract killing case and may have confused the jury that this was to be taken as fact rather than that it was a matter that the state had to prove. In context, however, it was clear that the prosecutor was stating that this was the theory of the case, not that this was a matter the jury could take as given, and the jury was repeatedly told on multiple other occasions that this was a contested issue. No manifest injustice resulted from the statement.

■ *Victim Impact Argument.* Defendant objects to the prosecutor's comments that "[t]his child was denied the joy of having her mother seeing her while she is going to high school proms, the joy of having her mother help her plan her wedding, the joy of her mother seeing her daughter grow in with a family, ..." and "the tragedy Phyllis will never forget and that picture of your sister laying lifeless on the floor." He argues that these were really arguments about the impact of the murder on the victim's family and that such arguments are proper only in penalty-phase closing argument.

The second comment was simply a description of what Phyllis experienced as the person who discovered the body and did not constitute victim impact evidence. The first comment did address the impact of the murder on the victim's daughter, although, as the prosecutor argues, the comment was one that the jury's common sense would tell them was true even if it

had not been mentioned. Nonetheless, it should have been saved for penalty-phase closing argument. *See State v. Simmons*, 955 S.W.2d 752, 766 (Mo. banc 1997) (victim impact evidence is permissible in penalty-phase closing argument). But, considered, as here, for plain error, it cannot be said the outcome of the case was affected or manifest injustice occurred.

■ *Improper Personalization by Prosecutor.* Defendant argues that the prosecutor improperly personalized the case by telling the jury, "[Y]ou know what, I don't think most people in here believe that Michael actually exists." This was not improper personalization, however, but merely a permissible comment by the prosecutor on reasonable inferences to be drawn from the evidence. *Clemmons v. State*, 785 S.W.2d 524, 530 (Mo. banc 1990); *State v. Weathersby*, 935 S.W.2d 76, 79 (Mo.App. W.D.1996). This includes "the right, within the limits of closing argument, to provide the State's view on the credibility of witnesses." *Clemmons*, 785 S.W.2d at 530.

■ *Improper References to Facts Not in Evidence.* Defendant also argues that three comments by the prosecutor constituted improper references to facts not in evidence. He is incorrect. The first comment, "[I]f a contract killing is not cool reflection then, there is not cool reflection," was merely a comment on whether the state had met its burden of proof as to the state of mind necessary for first-degree murder. The second comment, made to counter defendant's claim that he confessed to the crime only to protect his family from further interrogation and not because he was guilty, was a comment on the credibility of that claim.[4] The third comment objected to was made in re-

---

4. The prosecutor said, "This is a correctional officer who deals with prisoners in the course of his profession, do you think that he's ever met a person yet who's told him they confess-ed to a murder to make it easier for his family to help himself out, to help is [sic] family for him to confess to the murder he had no involvement in?"

sponse to defendant's argument that the fact he did not cash a check to pay the killer showed he did not hire someone to kill his ex-wife. While the comment may not have been very persuasive, since all criminals must be found guilty beyond a reasonable doubt in order to be convicted, the comment that prisons are full of such people cannot be considered an attempt to argue matters not in evidence.[5]

■ *Uncharged Misconduct.* Finally, defendant argues that the prosecutor referred to "uncharged misconduct" when he stated, "And this business about Florida, he couldn't do any of the things he said because he was in Florida. Was anybody offended by that? Here's a guy who hasn't paid child support taking trips to Florida. It's not just a trip, he's looking at a time share to buy into." But, this comment must be considered in context.

The portion of the argument defendant objected to is only part of the prosecutor's argument on this point. Defendant was accused of killing his ex-wife to avoid paying $500 per month in child support. The prosecutor's argument continued, "I guess he'd have money freed up, he wasn't going to have to be paying five hundred dollars a month. He was expected to give his ex-wife five hundred dollars a month from the family budget he could be using in the time share in Florida." In other words, the argument was a proper comment on defendant's motive for the murder—to save child support money that he could use for other purposes—not an attempt to refer to uncharged misconduct.

## III. PENALTY PHASE ALLEGATIONS OF ERROR

Defendant argues that numerous errors occurred in the penalty phase of the trial,

including that: (A) the court erred in refusing to give a no-adverse-inference instruction during the penalty phase; (B) the state failed to charge aggravators in the indictment and, thus, was precluded from seeking the death penalty; (C) there was insufficient evidence to support the sole aggravator found by the jury, that this was a contract killing; (D) the prosecutor was improperly permitted to comment on defendant's failure to testify in the penalty phase and to make other improper closing arguments; and (E) the sentence of death is disproportionate to his crime and to the sentences of others for similar crimes.

### A. Refusal to Give No–Adverse–Inference Instruction

■ Defendant testified in the guilt phase of the trial that he was innocent, that his confessions were false, and that he was not involved in his ex-wife's death. The jury apparently rejected his testimony, for it convicted him of first-degree murder. In the penalty phase, the state presented the testimony of Ms. Cantrell's sister and brother as to the impact of the victim's death on her family. Defendant called nine family members, friends, and co-workers to testify as to his character and childhood and to ask for mercy. Defendant himself chose not to again testify in the penalty phase of the trial.

During the penalty-phase instruction conference, defense counsel requested that a no-adverse-inference instruction be read to the jury. Counsel proposed that the court give an instruction modeled after MAI–CR3d 308.14, but omitting the words

---

5. The prosecutor said, "Penitentiaries in the state of Missouri are filled with people who have been found guilty beyond a reasonable doubt. It is not an impossible burden just because of this nonsense of—about Michael and we couldn't prove that he bought the checks."

"of guilt." The offered instruction would have stated [with the deleted words in brackets]:

> Under the law, a defendant has the right not to testify. No presumption [of guilt] may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify.

The trial court refused to give the requested instruction, stating "as I read that instruction, the words 'of guilt' are not in—they appear to be substantive in that instruction, which would indicate it only applies to the guilt phase." In other words, the trial court thought that a defendant in a capital case was only entitled to a no-adverse-inference instruction in the guilt phase.

The trial court was incorrect. Applying the Supreme Court of the United States' decisions in *Estelle v. Smith*, 451 U.S. 454, 468, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), and *Carter v. Kentucky*, 450 U.S. 288, 305, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), this Court held in *State v. Storey*, 986 S.W.2d 462 (Mo. banc 1999), that a defendant's right not to have adverse inferences drawn from his exercise of his privilege against self-incrimination applies to the penalty as well as to the guilt phase of a capital murder trial.

In *Storey*, defendant testified in the guilt but not the penalty phase of his trial. On appeal, the penalty-phase verdict was reversed and the case was remanded for a new penalty-phase trial. Storey did not testify in the new penalty-phase trial, nor did the jury hear his testimony from the original guilt-phase trial. Defendant asked the court to instruct the jury that it could not draw an adverse inference from his failure to testify, but the court refused to give the instruction, believing that the right to such an instruction applied only to the guilt phase of a trial. This Court reversed, stating:

> "[T]he Fifth Amendment requires that a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so." *Carter*, 450 U.S. at 300, 101 S.Ct. 1112. There is "no basis to distinguish between the guilt and penalty phases of [a] capital murder trial so far as the protection of the Fifth Amendment privilege is concerned." *Estelle* . . . **Therefore, when a defendant does not testify in the penalty phase of a capital murder trial, the court must give a "no-adverse-inference" instruction if the defendant so requests.**

*Storey*, 986 S.W.2d at 464 (bold added).

This Court reaffirmed *Storey* in *Mayes*, 63 S.W.3d at 636–37, handed down shortly prior to the trial of this case. In *Mayes*, defendant did not testify in the guilt or penalty phases of the trial. The trial court instructed the jury in the guilt phase that no presumption of guilt could be drawn from his failure to testify, but refused to instruct the jury in the penalty phase that no inference could be drawn from his failure to testify then either. *Id.* at 634–35. The jury imposed the death penalty. This Court reversed, reaffirming that the giving of the no-adverse-inference instruction in the penalty phase is mandatory when requested, even where such an instruction has been given in the guilt phase. *Id.* at 636–37. Accordingly, MAI–CR3d 313.30A, Note on Use 4, states that various guilt-phase instructions, including MAI–CR3d 308.14's no-adverse-inference instruction, should be modified to be used in the penalty phase when appropriate. Further, MAI–CR3d 308.14, Note on Use 2, states that instruction 308.14.1 must be given if the defendant does not testify and requests it be given.

The state implicitly concedes that the trial court's refusal to instruct the jury violated *Storey* and *Mayes*, but says that

this should be excused because defense counsel did not cite them or Note on Use 4 to the judge. While those citations would have been helpful, the state cites no authority that in addition to requesting a mandatory instruction a defendant must also submit a brief in support of the request in order to complain on appeal when the instruction is not given. There is no such requirement.

The state's other point has more merit. It notes that the instruction that defendant offered was taken from the language proffered in *Storey* and *Mayes* and would simply have instructed the jury that no presumption arose and no inference of any kind should be drawn from a defendant's failure to testify. That may have been proper language in those cases, the state says, in which the juries being instructed had never heard any testimony from either defendant. Here, however, Mr. Edwards did testify in the guilt phase before this same jury, and the jurors were elsewhere told in the instructions that they should consider all of the evidence offered in the guilt phase, as well as that in the penalty phase, in arriving at their verdict. It would have been inaccurate, and may have confused the jurors, to tell them they could not consider defendant's failure to testify, for he had testified in the guilt phase, and the instructions also told the jurors that they should consider that testimony.

This Court agrees that, in the circumstance in which a defendant testifies in the guilt phase of a capital case but not in the penalty phase, and the two phases are tried before the same jury, as here, the proper course would be to modify the no-adverse-inference penalty-phase instruction implicitly approved in *Storey* to state that no presumption or inference should be drawn "from the fact that the defendant did not testify in the penalty phase."

Defendant did not do that here, and, as this Court recently noted in *State v. Derenzy*, 89 S.W.3d 472, 475 (Mo. banc 2002), a defendant's "failure to submit a correct instruction under these circumstances renders his claims of error unpreserved. *State v. Wurtzberger*, 40 S.W.3d 893, 897 (Mo. banc 2001)." Here, however, it seems harsh to apply this rule where the language that defendant offered was that implicitly approved for use in the penalty phase by *Mayes* and *Storey*, the instruction was not so confusing that the jury would not have deciphered it, and the objection that the state raises now was not raised below, nor was it the reason that the trial court refused to give the requested instruction. The trial court never reached the instruction's wording, since it believed there was no right to an instruction of any wording in the penalty phase.

Ultimately, however, the Court need not determine whether in these circumstances the issue should be considered subject only to plain error review, *see, e.g., Derenzy*, 89 S.W.3d at 475 (where instruction clearly wrongly referred to different crime but court never reached wording and instead rejected it out-of-hand for invalid reason, court would review for plain error). For, even if this Court considers the error preserved, reversal for a new penalty phase will not result.

*Storey* held that where an error in failing to give a no-adverse-inference instruction is preserved this Court will reverse unless the state shows that the error was harmless beyond a reasonable doubt. *Storey*, 986 S.W.2d at 464 (determining that a harmless error analysis is applicable to a refusal to give such an instruction under the principles set out in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113

L.Ed.2d 302 (1991)). *Accord, Mayes,* 63 S.W.3d at 636–37.

In *Storey,* the error was not shown to be harmless, for defendant did not testify and the jury was never told, except in voir dire, that it could not use this failure to testify against him. In such a case, the jury "can be expected to notice a defendant's failure to testify, and, without limiting instructions, to speculate about incriminating inferences from a defendant's silence." *Carter,* 450 U.S. at 304, 101 S.Ct. 1112.

In *Mayes,* defendant did not testify in either phase of the trial. The very fact the court gave a no-adverse-inference instruction in the guilt phase, but not the penalty phase, might have affirmatively misled the jury into believing it could consider defendant's silence on the issue of punishment, just not on the issue of guilt. *Mayes,* 63 S.W.3d at 636–37.

Here, the defendant *did* testify, albeit in the guilt phase, and the jury was told it could consider that testimony when it was told that it could consider the guilt-phase evidence in deciding punishment. Thus, defendant was not entirely silent, and the jury had his testimony to consider in both phases. While under the law he was still entitled to an instruction that the jury could not consider his failure to again testify in the penalty phase against him, in this circumstance the jury would not draw the same, almost automatic, negative inference from the fact that he did not testify in the penalty phase that it draws where a defendant fails to testify at all.

It is perhaps not surprising, therefore, that defendant has cited to this Court no case that has reversed due to the trial court's failure to give a no-adverse-inference instruction in these circumstances. The state has uncovered only a single case that has addressed the issue whether a no-adverse-inference instruction must be given on facts such as these, *Beathard v.* *State,* 767 S.W.2d 423 (Tex.Crim.App. 1989). In *Beathard,* defendant testified in the guilt phase that he was not involved in the victim's murder. He also related "his version of the facts, his current and past employment, his educational attainments, his family background, and his lack of any criminal record." *Beathard,* 767 S.W.2d at 433 n. 17. The jury rejected defendant's claim of uninvolvement, finding him guilty of first-degree murder.

In the *Beathard* penalty phase the state presented no additional evidence. Defendant presented six additional witnesses, but did not testify again himself. Defendant asked for a no-adverse-inference instruction, but the court refused to give one. Defendant was found guilty. On appeal, the Texas Court of Criminal Appeals found the refusal to give the instruction error, but held it was harmless beyond a reasonable doubt:

> The right to a "no-adverse-inference" instruction is rooted in a jury's natural tendency to assume that the decision not to testify stems from a defendant having something to hide. See generally *Carter v. Kentucky,* supra. In the instant case, this was not a concern. By testifying during guilt/innocence, the jury heard numerous things from the appellant. In addition, the state presented no evidence at the punishment phase. Thus, appellant was not placed in a position where the jury would expect him to counter factual assertions made by the state.

*Id.* at 432. In a footnote, *Beathard* noted, "[a]side from a plea for mercy, which was made by appellant's mother, we can think of nothing that appellant could have said during the punishment phase that he had not already said." *Id.* at 432 n. 17. It continued:

> In fact, if the jury was to draw any improper inference from a failure to

present a case, it would have been against the state. Appellant did, however, call six witnesses. Limited to the unusual factual setting of this case, we find that the trial judge's error in failing to give a "no-adverse-inference" instruction was, beyond a reasonable doubt, harmless.

*Id.* at 432–33.

This Court finds the approach taken in *Beathard* to be the correct one. By this, the Court does not mean that it will find a Missouri court's refusal to give the instruction is always harmless if the defendant has testified in the guilt phase. Rather, in deciding whether the error was harmless in a case in which defendant testified in the guilt but not the penalty phase and the court refused to give a no-adverse-inference instruction in the penalty phase (a situation that should not occur again following this opinion), it is appropriate for this Court to look at the specific facts of the case to see whether the jury would have expected the defendant to also testify in the penalty phase and draw a negative inference from his failure to do so.

If, in the guilt phase, for instance, defendant admitted to killing the victim but claimed self-defense or a mental state less than that required for first-degree murder, then the jury might expect that in the penalty phase defendant would take the stand, express remorse, and offer reasons why his punishment should be life imprisonment rather than death. But, in other circumstances, such as this case, no such expectation would arise.

Defendant testified in the guilt phase that he was a corrections officer for the City of St. Louis; that he was innocent; that his confessions were coerced and false; and that he had no connection with his ex-wife's death and did not hire "Michael" or Mr. Wilson to kill her. The jury

clearly rejected this testimony by finding defendant guilty of first-degree murder in the guilt phase. In the penalty phase, the state offered very limited additional evidence, presenting only two witnesses, both of whom testified only on the issue of victim impact. In response to this limited evidence, the defense presented nine additional witnesses, including family, co-workers, and friends, who testified why defendant should not be sentenced to death. None of these witnesses had testified in the guilt phase.

In these circumstances, the jury would not have expected defendant to again take the stand and to be the sole witness to testify in both phases of the trial. Indeed, as in *Beathard,* there is little more he could have said, except repeat a story the jury had already rejected and ask for mercy, and other witnesses asked for mercy on his behalf. On these particular facts, the failure to give the no-adverse-inference instruction was harmless beyond a reasonable doubt.

*B. Failure to Charge Aggravators in Indictment*

Defendant argues that the trial court should have quashed the information because it failed to specifically charge him with the statutory aggravating circumstances later submitted in the penalty phase. He alleges that the principles set out in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), require that aggravating circumstances be set out in the indictment. This Court has repeatedly rejected similar arguments. Where, as here, the state gave the defendant pretrial notice, pursuant to section 565.005, of the aggravating circumstances it intended to prove at the penalty phase of trial, it was not required to list them in the indictment. *State v. Gilbert,* 103 S.W.3d 743, 747 (Mo. banc 2003); *State*

*v. Tisius,* 92 S.W.3d 751, 766–67 (Mo. banc 2002); *Cole,* 71 S.W.3d at 171. The trial court did not error in overruling defendant's motion to quash.

### C. Insufficient Evidence Supports Sole Aggravator

The state submitted three statutory aggravating circumstances against defendant. The jury did not find against defendant on two of the aggravators—that he had murdered Ms. Cantrell for money or that he had murdered her because she was a witness in a pending prosecution for criminal non-support. The jury did find the third aggravator beyond a reasonable doubt, however—"Whether the defendant hired Ortell Wilson and/or a person known only as Michael to murder Kimberly Cantrell."

■ Defendant contends that there was insufficient evidence to prove the sole statutory aggravator found by the jury beyond a reasonable doubt; thus, the court should not have submitted it, and the judgment imposing the death penalty should be set aside. In support, he first correctly notes that the state cannot rely on Mr. Wilson's statements incriminating defendant since they were not admitted or were admitted only to show the course of the police investigation, not for their truth. Of course, there was still defendant's confession that he hired Mr. Wilson or "Michael" to murder his ex-wife. But, as defendant notes, out-of-court confessions, statements, or admissions by the accused are generally not admissible unless they are corroborated by independent evidence, either circumstantial or direct, showing the *corpus delicti* of the crime. *State v. Fears,* 803 S.W.2d 605, 608 (Mo. banc 1991); *State v. Summers,* 362 S.W.2d 537, 542 (Mo.1962). Here, defendant argues, if his confession is not considered, and since Mr. Wilson's confession cannot be considered, there is no corroborating evidence, and so no *corpus*

*delicti,* and the aggravating circumstance should not have been submitted.

■ The burden to establish the *corpus delicti* is upon the state. *State v. Black,* 611 S.W.2d 236, 240 (Mo.App. E.D. 1980). The *corpus delicti* in a homicide case consists of two elements: (1) proof of the death of the victim and (2) evidence that the criminal agency of another was the cause of the victim's death. *Fears,* 803 S.W.2d at 608. These factors may be shown by circumstantial evidence, but are not established until it has been proved that the death was not self-inflicted nor due to natural causes or accident. *State v. Meidle,* 202 S.W.2d 79, 81 (Mo.1947). The *corpus delicti* cannot be presumed and must be proved by legal evidence sufficient to show that the crime charged has been committed by someone. *Summers,* 362 S.W.2d at 542.

■ As applied here, this Court need not decide whether proof of the *corpus delicti* only requires corroboration of the fact of the murder, as the state argues, or whether it also requires corroboration of the existence of an aggravating circumstance, as defendant argues by analogy to and extension of the principles set out in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In either case, corroborating evidence may be circumstantial and "need not be absolutely conclusive of guilt or demonstrate impossibility of innocence, and the mere existence of other possible hypotheses is not enough to remove the case from the jury." *Fears,* 803 S.W.2d at 608, *quoting, State v. Payne,* 612 S.W.2d 353, 354 (Mo.App. E.D.1980). "It is enough if the state establishes by circumstantial evidence the 'appearance of acting in concert.'" *State v. Williams,* 897 S.W.2d 631, 635 (Mo.App. E.D.1995). Only "slight corroborating facts" are needed. *State v. McQuinn,* 361 Mo. 631, 235

S.W.2d 396, 397 (Mo.1951); *State v. Evans,* 992 S.W.2d 275, 285 (Mo.App. S.D.1999).

■ Defendant's argument that the state has not proved the *corpus delicti* is not well taken for numerous reasons. First, his argument in his point relied on is that, because of the lack of corroboration, the instruction submitting aggravators was not supported by the evidence. In other words, he alleges instructional error. Yet, he does not even allege that he objected to the relevant instruction on this basis. He failed, therefore, to preserve this issue for review. Rule 28.03 provides, *inter alia,* that no party may assign as error the giving of an instruction "unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Consequently, because defendant failed to object to the instruction prior to submission, the claim is not preserved for our review. *See, e.g., State v. Myers,* 989 S.W.2d 594, 596 (Mo.App. E.D. 1999); *State v. Brisco,* 934 S.W.2d 335, 336 (Mo.App. W.D.1996).

■ Second, the cases prohibit *admission* of a confession in the absence of proof of corroborative proof of the *corpus delicti.* The general rule, however, is that if otherwise inadmissible evidence comes in without objection, it may be considered in determining whether a submissible case has been made, its weight being for the jury. *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 863 (Mo. banc 1993); *see also State v. Butler,* 24 S.W.3d 21 (Mo.App. W.D.2000).

■ Here defendant did not object to admission of his statements on the basis that the state had not yet proved the *corpus delicti* of the crime. He objected to their admission on the basis that they were involuntary and obtained in violation of *Miranda,* objections found meritless.

Having failed to object to the admission of this evidence on the basis of lack of corroboration, defendant waived that objection to its admission. Once admitted without objection on this basis, however, there was no bar to use of his confession in support of submission of the statutory aggravator that defendant hired Mr. Wilson or another to murder his ex-wife. *Id.* Therefore, the trial court did not err in submitting this aggravator to the jury.

■ Third, even were the issue preserved, this Court would find no error. When a defendant "challenges the sufficiency of evidence to support an aggravating circumstance, the test is whether a reasonable juror could reasonably find from the evidence that the proposition advanced is true beyond a reasonable doubt." *State v. Brown,* 902 S.W.2d 278, 294 (Mo. banc 1995). The reviewing court does not weigh the evidence but determines whether it was sufficient to permit reasonable persons to have found the defendant guilty. *State v. Porter,* 640 S.W.2d 125, 126 (Mo. banc 1982). Upon a review for sufficiency of evidence, the reviewing court takes the evidence in the light most favorable to the verdict. *Fears,* 803 S.W.2d at 607.

Here, the state clearly established the *corpus delicti* of the crime charged with evidence other than the mere out-of-court confession of defendant. As to the occurrence of the crime itself, and its commission by Mr. Wilson, even without consideration of defendant's confession, the state presented evidence of Ms. Cantrell's death by being shot twice in the head on August 22, 2002. It also presented evidence that Mr. Wilson took a black bag to work with him that day, and Donnell Watson, Mr. Wilson's roommate, testified that he dropped Mr. Wilson off, carrying a black bag, at approximately 4:30 p.m. on August

22, at a location 200 to 300 yards from the victim's home.

The victim's neighbor testified that he saw a black man with a black bag trying to get into Ms. Cantrell's apartment shortly before 5:00 p.m., but no one answered—Ms. Cantrell did not leave work until shortly after 5:00 p.m. that night. She arrived home a few minutes later. At 5:15 p.m. or so, another neighbor heard two shots and a woman scream. Ms. Cantrell did not attend a class she was to attend that evening or go to work the next day. Family members found her shot to death in her apartment on the evening of August 23. Ortell Wilson knew defendant and worked for him at his apartments on Palm Street. Mr. Wilson looked like the person who the neighbor saw pounding on the victim's door shortly before the shooting, and the neighbor later identified him as the person who had tried to enter the victim's home. In Mr. Wilson's apartment, the police found a black bag like that carried by the assailant, containing rubber fingertips. This was sufficient evidence of the murder by Mr. Wilson.

In addition, the state presented evidence that defendant was having a dispute with his ex-wife over child support, that he had been charged with criminal non-support, and that he had a hearing in three days on that case. Hughie Wilson, Ortell Wilson's brother, testified that during the spring or summer of 2000, Mr. Edwards asked him where he could get a "throwaway" gun. Hughie also testified that when he went to visit Ortell at his apartment on about August 7, 2000, Mr. Edwards was in the apartment with Ortell, and Hughie saw a gun on a table that was similar to the gun used to kill the victim. Once Hughie arrived, Mr. Edwards told Ortell to put the gun away.

In addition, Donnell Watson, Ortell Wilson's roommate, testified that defendant again visited Mr. Wilson at the apartment at about 7:30 p.m. on the evening of August 21, 2000, the day before the murder. As noted, the next day Mr. Watson dropped Mr. Wilson off a few hundred yards from the victim's home at about 4:30 p.m. Mr. Wilson returned to the apartment at about 7:30 p.m., looking sweaty. At around 8:00 p.m., defendant came to the apartment to see Mr. Wilson.

■■■ This evidence, that Mr. Wilson had a gun and defendant told him to hide it, that he and defendant met the night before the crime and the night of the crime, that defendant had a motive, that defendant had sought to obtain a gun that could not be identified a few weeks to months before the murder, as well as the evidence showing Mr. Wilson worked for defendant, that he committed the murder, and the actual finding of the gun that was used in the murder, is more than sufficient to constitute the "slight corroborating facts" needed to prove the *corpus delicti.* Defendant's confession was properly admitted, and the court did not err in submitting this aggravator to the jury.

### D. Improper Penalty Phase Comments in Closing Argument

■■■ Defendant also raises numerous claimed errors in regard to the prosecutor's closing argument in the penalty phase of the trial. As was true in regard to guilt-phase closing argument, counsel failed to object to any of the arguments about which he now complains. These claims are reviewable, if at all, only for plain error. Rule 30.20; *State v. Ervin,* 835 S.W.2d 905, 920 (Mo. banc 1992). As this Court noted in *State v. Clemons,* 946 S.W.2d 206, 224 (Mo. banc 1997), "[T]he 'plain error' rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review." *Id.,* cit-

*ing, Ervin,* 835 S.W.2d at 920. To justify plain error review defendant's claim must facially establish substantial grounds for believing that manifest injustice or a miscarriage of justice resulted from the error. *Id.; Brown,* 902 S.W.2d at 284; *State v. Parker,* 856 S.W.2d 331, 333 (Mo. banc 1993). None of the claims raised justify plain error review. The Court nonetheless *ex gratia* addresses each briefly.

Defendant claims that the prosecutor commented on defendant's failure to testify by stating, "What's the one thing we haven't heard about that Kimber Edwards has expressed to anyone, remorse. Any remorse, any sadness about the killing of Kimberly Cantrell and why haven't you heard about it? Because he hasn't obviously expressed it to anybody." But, numerous cases have approved of a prosecutor's reference to a defendant's lack of remorse because it is relevant to defendant's character, an important issue in deciding punishment. These cases reject similar claims that such references are an improper comment on the defendant's failure to testify. *See, e.g., State v. Anderson,* 79 S.W.3d 420, 439–40 (Mo. banc 2002); *State v. Tokar,* 918 S.W.2d 753, 769 (Mo. banc 1996). This Court does also in this case.

██ Defendant also complains that the prosecutor commented in closing argument that the prosecution believed that this was a contract killing and that it was done to shut up a witness. He further contends the state argued that witnesses would be afraid to testify in the future if they "felt there was a chance they'd be killed," and "[i]f there was ever a case in which the death penalty was merited, it's a case in which a person has a criminal witness scheduled because the system will break down." Defendant said that this made the prosecutor an unsworn witness by suggesting he had outside, superior knowledge as

to why the case merited death. But, the state had submitted as statutory aggravators that this was a contract killing and that this killing was done to prevent a witness from testifying. It was not improper for the prosecutor to argue that the evidence supported these two aggravators and supported imposition of the death penalty. Moreover, the prosecutor was not suggesting he had superior, secret information, but rather was stating that he believed killing to keep a potential witness from testifying merited death. As this Court noted in *Clemons,* a "prosecutor may state his personal opinions on whether the death penalty should be imposed so long as that argument is fairly based on the evidence." *Clemons,* 946 S.W.2d at 231.

██ Defendant argues plain error because the prosecutor referred in closing argument to defendant's failure to pay child support and said, "[M]ost father's [sic] in their divorce cases don't enjoy child support, but you know they do it because it's the right thing to do and if they love their child, they really do it. This love of Erica, this child he wouldn't even support, I don't buy it." Again, a prosecutor is permitted to comment on and make reasonable inferences from the evidence. "Prosecutors may also comment on the evidence and the credibility of witnesses, even to the point of belittling or discussing the improbability of specific testimony." *Id.* at 229, *citing, State v. Weaver,* 912 S.W.2d 499, 513 (Mo. banc 1995). Defendant sought mercy from the jury by presenting numerous witnesses who testified to his love for Erica and the rest of his family. It was not improper for the prosecutor to comment on the lack of credibility of the testimony about that love, particularly where the state claimed defendant killed his ex-wife to avoid paying child support for Erica.

■ Similarly, the Court rejects defendant's argument that it was improper for the prosecutor to comment on why he believed, based on the evidence, that defendant's middle-class lifestyle was an aggravating rather than a mitigating factor, because he decided to kill his wife so he would have more money to maintain that lifestyle. This was simply a comment on the testimony, and not improper. It was up to the jury to determine whether defendant's character and lifestyle constituted mitigation.

### E. Disproportionate Sentence

■ Defendant argues that his sentence was a product of bias and prejudice and was disproportionate to his crime under section 565.035.3.[6] This Court has an independent duty to review a death sentence under section 565.035.3, RSMo 2000, to determine whether: (1) it was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) there was sufficient evidence to support the finding of a statutory aggravating circumstance and any other aggravating circumstance found; and (3) the sentence was excessive or disproportionate to the penalty imposed in similar cases, considering the crime, strength of the evidence, and the defendant. *State v. Clayton,* 995 S.W.2d 468, 484 (Mo. banc 1999). The ultimate purpose of this review is to prevent freakish and wanton applications of the death penalty. *Black,* 50 S.W.3d 778.

In support of his claim that the sentence was the product of bias and prejudice, defendant points to three issues that he alleged constituted trial error—the exclusion of two African–American jurors in violation of *Batson;* the refusal to allow defendant to explore the effect of the fact that he murdered his daughter's mother; and the lack of a no-adverse-inference instruction—and alleges that these errors caused the jury to reach its verdict on the basis of passion and prejudice rather than on the basis of the evidence. Having found no reversible error in any of the regards noted, this Court rejects the claim that any such error caused bias and prejudice on the part of the jury.

Defendant also argues that the single aggravator found by the jury—that defendant hired "Michael" or Ortell Wilson to commit the murder—was not supported by the evidence. For the reasons set out above in rejecting the claim that there was insufficient evidence to submit that aggravator in the instructions, this argument is also rejected.

Last, defendant claims that the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. In support, he points to his offer of evidence that Ortell Wilson was sentenced to life imprisonment rather than death for the murder of Kimberly Cantrell. He argues that it is inherently disproportionate that he should receive death when the person who actually shot his ex-wife received a life sentence. He notes that in two other cases involving contract killings of a spouse, the contract killers were sentenced to death, but the spouses who hired the contract killers were sentenced to life in prison, and argues there is no meaningful

6. Defendant also argues that his constitutional rights were violated because his sentence was disproportionate to that imposed in other similar cases. The Supreme Court of the United States has not held that a proportionality review is constitutionally required. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). This Court reviews proportionality under the statute. Defendant's argument that this Court's proportionality review is unconstitutional because it provides inadequate notice and opportunity to be heard is rejected for the reasons stated in *State v. Clay,* 975 S.W.2d 121, 146 (Mo. banc 1998).

way to distinguish his case from theirs, citing *Clay,* 975 S.W.2d at 146, and *Basile,* 942 S.W.2d 342. In addition, he notes, Erica has asked that her father not be sentenced to death, even though she believes he killed her mother. In light of this evidence, he argues, this Court should find his sentence of death disproportionate to his crime and to the penalty imposed in similar cases.

█ None of the three "similar" cases that defendant cites are actually similar to his situation. Ortell Wilson pleaded guilty and as part of his plea bargain received a life sentence. In *Basile,* the actual killer was given a death sentence, but the spouse was *acquitted* in state court, not convicted (although he was convicted and given a sentence of life imprisonment in a separate federal prosecution. *United States v. Basile,* 109 F.3d 1304, 1306 (8th Cir.1997)). In *Clay,* the spouse was found guilty of only second-degree murder; therefore, the death penalty was not an option; the contract killer was given a death sentence. *Clay,* 975 S.W.2d at 146. "Co-actors' plea agreements and convictions for crimes other than first-degree murder are not to be considered in the proportionality review of a death sentence." *Id.*

Second, even were these specific cases more analogous, section 565.035.3 states that in determining whether the punishment is disproportionate, the Court is not just to consider the type of crime—that is, whether it is a murder for hire, a passion-related crime, a drug-related killing, and so forth—but also *"the strength of the evidence and the defendant." Sec.* 565.035.3 (emphasis added). Moreover, section 565.035.3 requires this Court to consider whether the death penalty is disproportionate or excessive "to the penalty imposed in similar cases," not just in a specific other case in which a similar category of

crime was committed. As this Court noted in *Clay,* this means that:

> The issue when determining the proportionality of a death sentence is not whether any similar case can be found in which the jury imposed a life sentence, but rather, whether the death sentence is excessive or disproportionate in light of "similar cases" as a whole.

*Clay,* 975 S.W.2d at 146.

█ For this reason, the proportionality of the death penalty can never be determined solely by looking at whether it was imposed in some other particular case. The fact that, on the particular facts of particular cases, juries or judges determined not to impose the death penalty on certain defendants does not mean that other persons who committed similar crimes can never receive the death penalty. They, too, must be judged for their crime based on their individual circumstances, both good and bad. So, too, must defendant be judged on the crime and the aggravating and mitigating circumstances in his case.

█ This makes sense, for this is what the instructions tell the jury to do—to consider all of the evidence, including all of the aggravating and mitigating circumstances, in determining whether to impose the death penalty. A death sentence is never mandatory. *Mayes,* 63 S.W.3d 615. It would be strange indeed if this Court then used an entirely different standard to judge whether the jury's imposition of the death penalty was disproportionate. This Court's role is not to apply a different standard, but rather to act as a safeguard by ensuring that a sentence of death is not imposed in a case in which to do so is freakish and disproportionate to the sentence given in similar cases considered as a whole.

Here, while defendant did not pull the trigger himself, he chose to hire a hit man for $1,600 to kill his ex-wife. There is evidence he did so to avoid paying child support. He did so the night before his ex-wife was to pick up his daughter. He planned the killing weeks or months in advance and expressed no remorse at all for his actions. He was a correctional officer, an office of public trust, familiar with the criminal justice system. He offered little evidence in the way of mitigation other than testimony from family and friends offered in his support. That testimony did nothing to explain how he could have arranged such a cold-blooded killing in order to avoid supporting his daughter.

In other cases, this Court has approved imposition of the death penalty for one defendant even where it appeared that an accomplice had done the actual killing. *Skillicorn,* 944 S.W.2d at 899 (death penalty not disproportionate even though defendant did not do the actual killing where victim was killed so that he would not alert the police, stating murder "to avoid inconvenience to the murderer exhibits a lack of respect for human life that has been held to warrant the harshest penalty"); *State v. Copeland,* 928 S.W.2d 828 (Mo. banc 1996); *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994); *State v. Kilgore,* 771 S.W.2d 57 (Mo. banc 1989); *State v. Schlup,* 724 S.W.2d 236 (Mo. banc 1987); *State v. Roberts,* 709 S.W.2d 857 (Mo. banc 1986) (defendant verbally directed attack on prison guard and then twice immobilized the guard while others stabbed him); *State v. Gilmore,* 681 S.W.2d 934 (Mo. banc 1984) (defendant ordered another to "take care of" the victim).

The cases defendant has identified in which a defendant received a life sentence are not comparable for the reasons noted, and on these facts the Court does not find that the imposition of the death sentence in this case was wanton or freakish. While the jury was not required to impose the death penalty, while it is never required to do so, its decision to impose the harshest of penalties was not disproportionate to the crime, the evidence or the defendant. *Sec.* 565.035.3.

## IV. CONCLUSION

Because none of Mr. Edwards' claims on appeal are meritorious, the judgment and sentence of death are affirmed.

WHITE, C.J., WOLFF, BENTON, PRICE and LIMBAUGH, JJ., concur.

TEITELMAN, J., concurs in separate opinion filed.

RICHARD B. TEITELMAN, Judge, concurring.

I concur. I write separately to emphasize the importance of careful judicial scrutiny of *Batson* claims and cases involving cumulative trial errors.

As the principal opinion notes, courts should review more carefully peremptory strikes based upon occupation because, in the vast majority of cases, a prospective juror's employment has nothing to do with his or her ability to fairly weigh the evidence and arrive at a just decision. For the same reason, courts should also review more closely attempts to justify peremptory strikes based upon vague references to a venireperson's attire, demeanor, and similar attributes. These attributes are largely irrelevant to one's ability to serve as a juror and expose venirepersons to peremptory strikes for no real reason except for their race. As Justice Marshall predicted in *Batson,* if these and similar justifications are routinely deemed sufficient, then the protections afforded by *Batson* will be rendered illusory. *See Smulls v. State,* 71 S.W.3d 138, 159 (Mo. banc 2002) (J. Wolff concurring) (citing

*Batson v. Kentucky*, 476 U.S. 79, 106, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)(J. Marshall, concurring)). However guilty a defendant may be, the law requires that a conviction only be obtained through a fair trial. The right to sit before a jury of one's peers, chosen not because of race, but because of their standing as citizens doing their civic duty, is essential to a fair trial.

Additionally, courts should remain cognizant of the possible prejudicial impact of cumulative errors. A new trial can be ordered due to cumulative error, even without deciding if any individual error constitutes grounds for reversal. *See Crawford ex rel. Crawford v. Shop 'N Save Warehouse Foods, Inc.*, 91 S.W.3d 646, 652 (Mo.App.2002); *State v. Cole*, 867 S.W.2d 685, 687 (Mo.App.1993); *Faught v. Washam*, 329 S.W.2d 588, 604 (Mo.1959); *but see State v. Gardner*, 8 S.W.3d 66, 74 (Mo. banc 1999); *State v. Gray*, 887 S.W.2d 369, 390 (Mo. banc 1994).

The trial errors limiting Edwards' voir dire and refusing to give a no-adverse-inference instruction during the penalty phase are troublesome. The law requires that the no-adverse-inference instruction should have been given, and it would have been a simple matter to so instruct the jury and emphasize the importance of not considering Edwards' decision not to testify in the penalty phase. The objective in a criminal trial is to provide a fair trial and let the jury decide guilt or innocence without subtly stacking the deck against the defendant. Although the errors in this case do not warrant reversal, courts should be mindful of the effect of errors that, while harmless when taken alone, have the cumulative effect of prejudicing the defendant.